# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

MONIQUE G. MIMS
o/b/o A.C.R., a minor,

    *Plaintiff*,

*v.*                        CASE NO. 13-CV-13494

COMMISSIONER OF            DISTRICT JUDGE PATRICK J. DUGGAN
SOCIAL SECURITY,           MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff's minor child, A.R., is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

the Commissioner's decision denying Plaintiff's claim for supplemental security income ("SSI") benefits for Plaintiff's minor child. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 18.)

Plaintiff's son, A.C.R., was nine years old at the time of the most recent administrative hearing. (Transcript, Doc. 13 at 74-75, 164.) Plaintiff filed the instant claim on October 22, 2010, alleging that A.C.R.'s disability began on September 1, 2009. (Tr. at 164.) The claim was denied at the initial administrative stages. (Tr. at 83.) In denying the claims, the Defendant Commissioner considered attention deficit hyperactivity disorder ("ADHD") and speech and language delays as possible bases of disability. (*Id.*) On November 22, 2011 and May 22, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Gregory Holiday, who considered the application for benefits *de novo*. (Tr. at 21-45, 46-73, 74-82.) In a decision dated June 26, 2012, the ALJ found that A.C.R. was not disabled. (Tr. at 42.) Plaintiff requested a review of this decision on December 15, 2011. (Tr. at 18-20.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on October 23, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 5-10.) Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1 at 1.)

### B.    Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to

the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon

an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party");
*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II, 42 U.S.C. § 401 *et seq.*, and the Supplemental Security Income Program ("SSI") of Title XVI, 42 U.S.C. § 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

A child will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations . . . ." 42 U.S.C. § 1382c(a)(3)(C)(I). To determine whether a child's impairment results in marked and severe

limitations, Social Security Administration ("SSA") regulations[2] prescribe a three-step sequential evaluation process:

1.   If a child is doing substantial gainful activity, the child is not disabled and the claim will not be reviewed further.

2.   If a child is not doing substantial gainful activity, the child's physical or mental impairments will be considered to see if an impairment or combination of impairments is severe. If the child's impairments are not severe, the child is not disabled and the claim will not be reviewed further.

3.   If the child's impairments are severe, the child's impairment(s) will be reviewed to determine if they meet, medically equal or functionally equal the listings. If the child has such an impairment and it meets the duration requirement, the child will be considered disabled. If the child does not have such impairment(s), or if the duration requirement is not met, the child is not disabled.

20 C.F.R. § 416.924(a). In the third step–namely, whether a child's impairment functionally equals the listings–the Commissioner assesses the functional limitations caused by the child's impairment(s). 20 C.F.R. § 416.926a(a). The Social Security regulations list specific impairments relevant to step three, some of which apply only to children. *Id.* § 416.924(d). A claimant bears the burden of proving that his or her impairment satisfies, or "meets," one of the listed impairments. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir.1995); *see also Hall ex rel. Lee v. Apfel*, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (child's claim). Once a claimant makes such a showing, an irrebuttable presumption of disability arises and benefits must be awarded. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "A" criteria are medical findings and "B" criteria "describe impairment-related functional limitations." *Id*. An impairment that shows some but not all of the

---

[2] For a history of these regulations, see *Molina v. Barnhart,* No. 00-CIV-9522(DC), 2002 WL 377529 (S.D.N.Y. March 11, 2002).

criteria, no matter how severely, does not qualify. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). If a child's impairments do not meet a listed impairment, they may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. 20 C.F.R. § 416.926a(a). A child's impairments "equal" a listed impairment when the child demonstrates a "'marked' limitation[ ] in two domains of functioning or an 'extreme' limitation in one domain." *Id.*

Domain analysis is equivalent to analysis of the "A" and "B" criteria for listed impairments and focuses on "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The regulations include six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *Id.*

When assessing a claimant's functional limitations, the Commissioner considers, among other factors, the child's ability to initiate and sustain activities, academic performance, and the effects of medications. 20 C.F.R. § 416.926a(a). A "marked" limitation is one which "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I). It "is 'more than moderate' but 'less than extreme.'" *Id.* "It is the equivalent of the functioning [the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

An "extreme" limitation "very seriously" interferes with the claimant's "ability to independently initiate, sustain, or complete activities." *Id.* § 416.a(e)(3)(I). It is "'more than marked,'" and represents "the rating [the Commissioner] give[s] to the worst limitations." *Id.* It is equivalent to standardized test scores at least three standard deviations below the mean. *Id.*

**D.      ALJ Findings**

The ALJ applied the Commissioner's disability analysis described above and found at step one that A.C.R. was a school-age child on October 22, 2010, the date the application was filed, and had not engaged in substantial gainful activity since the application date. (Tr. at 27.) At step two, the ALJ found that A.C.R.'s attention deficit hyperactivity disorder ("ADHD") and behavioral (conduct) disorder were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that A.C.R.'s combination of impairments met or equaled one of the listings in the regulations. (Tr. at 21-45.) Therefore, the ALJ found that A.C.R. was not disabled. (Tr. at 42.)

**E.      Administrative Record**

A.C.R. finished kindergarten in June 2008. (Tr. at 257.) The teacher noted that he had improved, but still needed help with learning the alphabet and rhyming words. (*Id.*) He became eligible for special education services in November 2008 due to his speech and language impairment. (Tr. at 250.) A.C.R.'s academic performance at the end of first grade, completed in 2009, was average or above average in most subjects. (Tr. at 249.) He was average–"C" or "C+"–in math, science, social studies, and writing. (*Id.*) He was above average–"B"–in "Reading/Language Arts," and below average–"D"–in art. (*Id.*)

On December 13, 2009, Dr. David L. Hayter, a licensed psychologist, examined Plaintiff. (Tr. at 273.) He noted that A.C.R. alleged behavioral issues include irritability, argumentativeness, and hyperactivity. (Tr. at 273-74.) His readings skills were below average and he received speech therapy, Dr. Hayter reported. (Tr. at 274.) During the examination he was alert, oriented, and could remember recent and remote events. (Tr. at 276.) Dr. Hayter suggested A.C.R. had limited capacity "to encode and learn." (*Id.*) His social judgment and reasoning were also impaired. (*Id.*) Overall,

8

Dr. Hayter concluded A.C.R. could acquire and use information, move and manipulate objects, and care for himself. (Tr. at 277.) He also observed that A.C.R. focused on the tasks during the examination. (*Id.*) However, A.C.R. had ADHD, a learning disability, and a Global Assessment of Functioning ("GAF") score of forty-five. (*Id.*) That GAF score indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

Teachers' reports sent to A.C.R.'s mother in the spring of 2010 revealed worsening behavior. (Tr. 294-97.) He was distracted and frequently socialized during classes. (Tr. at 294.) Many of his assignments were incomplete or never submitted. (*Id.*) He was physically restless as well. (Tr. 295-96.) The teacher also believed that he had learning difficulties. (Tr. at 296.)

A.C.R.'s academic grades in September 2010 were satisfactory in music, physical education, and science lab. (Tr. at 239.) However, he needed improvement in "Language Arts Enrichment" and art. (*Id.*) He received below average grades–"D" or "D-"–in all other subjects. (*Id.*)

A.C.R.'s mother described his daily activities in a form completed on November 23, 2010. (Tr. at 191-95.) He would play with others, particularly his cousins, but the play would frequently degenerate into arguments and fights. (Tr. at 191.) He did not respect adults and his teachers often called home to report inappropriate behavior. (*Id.*) He also wet his bed, missed school frequently, attended special speech therapy classes, needed help with personal care because he "[tried] to do stuff in a rush," and would throw items, including bricks, at others. (Tr. at 192-95.) He had household chores, including cleaning his room and taking out the garbage, which he completed

only if repeatedly requested. (Tr. at 192.) He could answer the phone and deliver messages, repeat stories, and explain his actions; but he did not prepare food, write letters, mow the lawn, or participate in clubs. (Tr. at 192-93.) Finally, she reported that he read at school and at home. (Tr. at 194.)

A.C.R.'s third-grade teacher, Ms. Flowers, filled out a similar form on November 24, 2010. (Tr. at 196-203.) A.C.R. did not have "an unusual degree of absenteeism." (Tr. at 196.) She then described his functioning in each of the six relevant domains. (Tr. at 197-202.) A.C.R. could acquire and use information: "[A.C.R.] is capable of doing this section independently. It depends upon if he has taken his medication. If medication was taken, he does much better." (Tr. at 197.) In any event, he had at most "[a]n obvious problem" in the various aspects included in this domain, not a "serious," or "very serious" one. (*Id.*) He had greater problems with attending and completing tasks, but again she observed that he could "manage these activities independently if he takes his medication." (Tr. at 198.) He also struggled with interacting and relating to others; she frequently asked him to return to his seat and leave other students alone. (Tr. at 199.) "Most of the time [he] complies without getting up and repeating . . . his activities." (*Id.*)

Ms. Flowers did not have a problem understanding his speech. (Tr. at 200.) A.C.R. did not have issues with his physical well-being or with moving and manipulating objects. (Tr. at 200, 202.) His personal care, particularly handling his emotions and frustrations, was a daily problem in school. (Tr. at 201.) However, she concluded that "[w]hen [A.C.R.] takes the medication prescribed for him, he acts appropriately in the classroom setting (comes into the classroom and sits; does his assignments; does not play; does not talk to others)." (Tr. at 202.)

Laura Wayburn, a disability consultant, assessed A.C.R. on December 31, 2010. (Tr. at 278-85.) A.C.R.'s mother accompanied him and explained his speech problems and had been receiving

10

special speech and language classes since 2008. (Tr. at 279.) A.C.R.'s behavior during the session was appropriate. (Tr. at 280.) He ranked in the tenth percentile in articulation, below the average range. (Tr. at 281). The intelligibility of his speech was at ninety percent, but Ms. Wayburn noted the "listener is easily able to accommodate for the predictable sound errors." (*Id.*) He did not seem to have motor-based speech disorders. (Tr. at 282.) Tests for expressive and receptive language were either low or borderline. (Tr. at 282.) Ms. Wayburn noted difficulties with syntax and articulation, but concluded that "overall he demonstrate[d] functional communication," and the articulation problem would not have a significantly adverse affect on his academic or social success. (Tr. at 284.)

A.C.R. had another mental assessment on January 4, 2011. (Tr. at 298-302.) A.C.R.'s mother noted his difficulties with others at school and his uncontrolled and angry behavior. (Tr. at 299.) She also stated that his medication did not help, but the examiner, Dr. Ronald Fenton, wrote that A.C.R. "was very focused and able to attempt all tasks in details and the questions that were asked of him today, so it appears the medication does help him with his attention." (*Id.*) A.C.R. reported having frequent contact with "a fair amount of friends," and admitted to disrespectful behavior towards his mother. (Tr. at 299.) His interests included video games, basketball, and football. (Tr. at 300.) Dr. Fenton observed that he appeared happy, spoke clearly, seemed to have rational and relevant thought processes, had normal abstract thinking skills, and followed directions. (Tr. at 300-01.) However, the examiner also wrote that A.C.R. was easily distracted, had poor social skills and aggressive behavior, and lacked age appropriate skills, such as the ability to ask questions and request assistance. (Tr. at 301.) Dr. Fenton assessed a GAF score of fifty, which represents the same general diagnosis as his first GAF score. (*Id.*)

Drs. Tariq Mahmood and Bruce G. Douglass completed a Childhood Disability Evaluation Form in January 2011. (Tr. at 87-90.) They found less than marked limitations, or no limitations at all, in the six relevant domains. (Tr. at 88-89.) A.C.R.'s language delays were severe, they noted, but did not impose marked limitations. (Tr. at 88.) Another section of the report, signed by Dr. Mahmood and a disability examiner, stated that A.C.R. received speech therapy twice each week. (Tr. at 90.)

On June 13, 2011, Ms. Flowers and A.C.R.'s mother and filled out Vanderbilt Assessment forms. (Tr. at 309-12.) Of the eighteen symptoms for ADHD, A.C.R.'s mother said he experienced five very often: did not listen, had difficulty staying organized, lost items, was easily distracted, and interrupts others. (Tr. at 309.) She thought his school performance and relationships with peers were each "[s]omewhat of a [p]roblem," and she rated his family relationships and extracurricular activities as "[a]verage." (*Id.*)

Ms. Flowers's form stated that A.C.R. had difficulties finishing assignments, organizing his materials, and staying focused. (Tr. at 311.) He would "[v]ery [o]ften" run and climb "excessively in situations in which remaining seated is expected," become angry and resentful, lose his temper, and defy adults. (*Id.*) She ranked his behavior as "Problematic" in various areas: class disruptions, assignment completion, organizational skills, reading, mathematics, and written expression. (Tr. at 312.) She added, "[A.C.R.] fails to do any assignments. He is capable of doing and completing many of the assignments. He appears to have more difficulty with mathematics. [A.C.R.] loves to read independently[,] especially science books." (*Id.*)

The next month, on July 8, A.C.R. had an initial assessment at Eastwood Clinics. (Tr. at 315.) The therapist noted A.C.R.'s history of impulsive behavior and recommended weekly sessions. (Tr. at 315-17.) The only therapy session at the Clinic occurred on July 28, 2011. (Tr. at

314.) The session focused on "ways to improve his attitude and his daily behavior." (*Id.*) The therapist assessed ADHD and oppositional defiance disorder, and assigned a GAF score of 40, representing the same diagnosis of "[s]erious symptoms" assessed by Dr. Hayter. (*Id.*) *See* Am. Psychiatric Ass'n, *supra* at 34. He was discharged after his single session; the therapist concluded he satisfactorily completed the treatment goals. (*Id.*)

In October 2011, A.C.R. was failing most subjects at school, except math, in which he had a "D-," and music, physical education, and science lab, all marked as satisfactory. (Tr. at 238.)

In December 2011, A.C.R.'s school completed an "Individualized Education Program Team Report." (Tr. at 213-17.) The form indicated that A.C.R. exhibited a moderate articulation delay and lisp. (Tr. at 214, 224, 230.) Also, he displayed limited self-control. (*Id.*) His most recent standardized tests showed that he was proficient in math and reading; but he currently received failing grades in school because he refused to work. (Tr. at 214.)

Dr. Nick Boneff examined A.C.R. on February 6, 2012 regarding his ADHD diagnosis. (Tr. at 304-07.) Dr. Boneff noted that A.C.R. took Concerta in 2009, and was taking Intuniv and Vyvanse at the time of the examination. (Tr. at 305.) The tests found that his verbal comprehension, perceptual reasoning skill, and full scale intelligence quotient ("IQ") were borderline, his working memory was average, and his processing speed was low-average. (Tr. at 306.) His GAF score of 51 indicated "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers.)" Am. Psychiatric Ass'n, *supra* at 34. His strengths were in "immediate and short-term memory and the ability to pay attention, and [he had] moderate strengths in the ability to engage in new learning of visual motor integration activities. . . . [and] reading and calculations." (Tr. at 307.) He struggled with verbal abstract

thinking. (*Id.*) Consequently, A.C.R. would likely achieve "a slight degree of success in school-type activities," but was better suited for simple tasks focusing on motor speed and memory skills. (*Id.*)

On February 10, 2012, A.C.R.'s special education provider, Ms. Maniscalco, filled out a teacher questionnaire rating A.C.R. in the six disability domains. (Tr. at 258-65.) She saw him five days per week for an hour and fifteen minutes each day, to assist him in math and reading. (Tr. at 258.) She reported that he had "very serious" problems in a few aspects of the first domain: comprehending math problems; organizing his oral explanations and descriptions; and expressing ideas in written form. (Tr. at 259.) A.C.R. needed "step by step sm[all] group assistance" and read at the second-grade level though he was now in the fourth grade. (*Id.*) He also had "serious" and "very serious" problems attending and completing tasks: focusing, carrying out multi-step instructions, changing activities without disrupting others, and finishing projects on time. (Tr. at 260.) A.C.R.'s "serious" and "very serious" problems interacting with others included the following: appropriately seeking attention and asking permission; following rules; expressing anger; respecting adult authorities; relating experiences and telling stories; and using adequate vocabulary and grammar. (Tr. at 261.) In the self-care domain, A.C.R. had a "very serious" problem handling frustration; he had "serious problem[s]" remaining patient, asserting emotional needs, and coping with the "daily demands of [the] school environment." (Tr. at 263.) He had no problem manipulating physical objects, and the only physical health issue the teacher noted was his ADHD diagnosis; she knew he took medication for ADHD, but did not know if he did so on a regular basis. (Tr. at 262, 264.)

At the hearing, the attorney asked A.C.R.'s mother about his behavior. (Tr. at 50.) She testified that he had behavioral problems at school and his teachers recently reduced his schedule

14

to half days during the current school year. (*Id.*) This change came after a he ran away from the school on a few occasions. (*Id.*) He attended special education classes in school everyday along with one other student. (Tr. at 52.) She then recounted various instances of his aggressive behavior at school: he threw a chair a teacher, although he said it was an accident; he flipped his desk and pretended to shoot his classmates; he fought with other students; stole from another student; and on one occasion, he punched lockers, rolled across the floor, and had to be picked up and carried out. (Tr. at 53, 56, 57.) The school suspended him many times, but his behavior remained the same. (Tr. at 53-54.) Nonetheless, she testified that "[s]ince they moved him on half a day," his behavior had improved. (Tr. at 53.)

His behavior at home did not differ. (Tr. at 55.) He would ignore his mother's requests to do his chores, and when he eventually complied he grew angry and would "want to take it out on his siblings." (*Id.*) His relationship with his siblings was "[s]ome days good, some days bad . . . ." (*Id.*) He punched walls, slammed doors, failed to care for his property, broke items, lied, and one time threw rocks at his grandmother's apartment building and his mother. (Tr. at 56-57.) He had friends at school, and played with his cousins at home, but did not have friends outside of school. (Tr. at 55.)

His academic performance was also lackluster. (Tr. at 54.) His teacher did not often assign homework, but A.C.R. refused to complete assignments at school. (*Id.*) Yet the change to half-days improved his academics as well. (*Id.*) He was failing every class before the change; at the time of the hearing he had "B's and C's." (*Id.*)

He currently took Vyvanse, an ADHD medication, and he had a therapy appointment set up after the hearing to see if he needed anger medication. (Tr. at 57-58.) He had taken medications for about two years, and A.C.R.'s mother testified that he used them consistently. (Tr. at 58.) She

15

noticed a difference in his behavior when he took medication: "[b]ecause he's doing his work now . . . now, we just focus on the anger problem . . . ." (Tr. at 59.) The medications came with side effects, such as headaches, dizziness, and loss of appetite. (*Id.*) However, A.C.R.'s mother said that many of the extreme behavioral incidents occurred while he was on the medication. (Tr. at 59-60.) He was also seeing a therapist. (Tr. at 58.)

The ALJ then asked A.C.R.'s mother whether A.C.R. could "tell time." (Tr. at 61.) He could, she replied. (*Id.*) He also knew how to avoid ordinary dangers in his house; however, he started a fire at a summer school program. (Tr. at 62.) He did not have a "best friend" because "one minute he's friends" with someone, "then the next minute they [sic] into it" fighting, then later they would make up. (Tr. at 63.)

The ALJ asked A.C.R. if he knew how to count money, which A.C.R. did. (Tr. at 64.) A.C.R. then correctly answered the ALJ's "little test" question about counting change. (Tr. at 65.) He could legibly print letters and numbers, but said that he did not write well. (*Id.*) He could subtract numbers. (Tr. at 66.) He liked to play video games against other people. (*Id.*) He admitted that he did not finish his chores every day and that he was frequently angry at others. (*Id.*) He said he fought when others hit him first, and sometimes when they did not. (Tr. at 67.) School had improved after his schedule changed to half days. (Tr. at 68.) Both of his grandmothers lived near him, and he liked to visit them. (Tr. at 68-69.) The ALJ confirmed that he could tell time by asking him to read a clock. (Tr. at 69.) A.C.R. said he could also read street signs. (Tr. at 70.)

**F.     Analysis and Conclusions**

**1.     Legal Standards**

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's child disability analysis to A.C.R.'s claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.      Substantial Evidence

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

"Functional equivalence is determined by 20 C.F.R. § 416.926a, which requires a 'marked' impairment in two 'domains' or an 'extreme' impairment in one domain." *Kelly v. Comm'r of Soc. Sec.,*314 F. App'x 827, 829 (6th Cir. 2009) (quoting 20 C.F.R. § 416.926a(d)). An extreme limitation is defined as one that "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities" and that is "more than marked." 20 C.F.R. § 416.926a(e)(3).

The ALJ concluded that A.C.R. had less than a marked limitation in acquiring and using information, (Tr. at 34), attending and completing tasks, (Tr. at 36), and caring for himself, (Tr. at 40); a marked limitation in interacting and relating with others, (Tr. at 38); and no limitation in moving and manipulating objects or in his health and physical well-being. (Tr. at 39.)

Plaintiff argues that the ALJ incorrectly held that A.C.R. did not meet, or that A.C.R.'s impairments did not functionally equal the requirements of Listing because "medical evidence supports a finding that A.C.R. has greater limitations that the ALJ found to be present." (Doc. 17 at 8.) Plaintiff specifically contends that the ALJ erred in three domains, asserting that A.C.R. has a marked to extreme limitation in acquiring and using information, and extreme limitations in

17

attending and completing tasks and relating and interacting with others. (Doc. 17 at 8-11.) In support, Plaintiff cites the special education teacher's assessment, the form completed by his third-grade teacher, and two progress reports from Hamtramck Elementary Public Schools. (Doc. 17 at 11.) Plaintiff includes no other evidence in the body of the argument, and fails to do more than report the evidence, rather than also analyzing it.

The ALJ's thorough decision, in contrast, considered all of the relevant evidence. (Tr. at 24-42.) Substantial evidence supports his determination that A.C.R. had a less than marked limitation in acquiring and using information. (Tr. at 33.) School-age children, according to the regulations, should be able to read, write, do math, and discuss history and science, both at school and in daily living. 20 C.F.R. § 416.926a(g)(2)(iv). Plaintiff cites the Maniscalco's opinion that he had "very serious problems" completing math questions, providing organized descriptions, and writing. (Doc. 17 at 9.) He had lesser issues in other areas. (*Id.*) Plaintiff also mentions Ms. Flowers's opinion. (*Id.*)

The ALJ was not required to give these non-medical opinions any particular deference. 20 C.F.R. §§ 404.1502; 404.1527(d)(2); 404.913(d)(2); SSR 06-03p, 2006 WL 2329939, at *1-2 (2006); *Perry ex rel. G.D. v. Comm'r of Soc. Sec.*, 501 F. App'x 425, 427 (6th Cir. 2012) (noting that the minor's "teachers are not acceptable medical sources"). The ALJ appropriately explained his reasons for providing Ms. Maniscalco's opinion little weight: she did not know whether he took his medication regularly, and "this is information one would expect a teacher to be aware of and note in order to adequately assist the claimant in achieving his academic goals." (Tr. at 32-33, 264.) Had the ALJ given the opinion more weight, there is no reason to believe that it would have required finding a marked or extreme limitation: while she marked three "very serious" problems, the other seven areas in the domain were either "obvious" or "slight" problems. (Tr. at 259.) Ms.

Flowers's opinion provides no help to Plaintiff's case: she found no "serious" problems in this domain, only "obvious" or "slight" issues in eight out of the ten relevant measures. (Tr. at 197.) She added that he could acquire and use information independently if he took his medication. (*Id.*) Elsewhere she wrote that he had "more difficulty with mathematics," but "love[d] to read independently[,] especially science." (Tr. at 312.) She also could understand his speech. (Tr. at 200.)

Other evidence offers additional support to the ALJ's findings. Dr. Hayter found that he could use and acquire information despite impairments. (Tr. at 277.) Ms. Wayburn thought that any speech impairments A.C.R. had could be "easily . . . accommodate[ed]" by the listener. (Tr. at 281.) "[O]verall," she concluded, "he demonstrate[d] functional communication." (Tr. at 284.) Dr. Fenton made similar observations. (Tr. at 300-01.) The ALJ's finding matched that of the medical consultants. (Tr. at 88.) A.C.R.'s mother stated at the hearing that Plaintiff's academic performance recently improved, now earning "B's" and "C's," and she suggested that her major concern was his anger issues. (Tr. at 54, 59.) Finally, his standardized academic tests scores included in a December 2011 report indicated he was proficient in math and reading–he struggled because he refused to work. (Tr. at 214.)

Substantial evidence also supports the ALJ's finding that A.C.R. had a less than marked limitation in attending and completing tasks. (Tr. at 36.) This domain examines "how well [the claimant is] able to focus and maintain . . . attention," and the claimant's ability to finish tasks at a reasonable pace. 20 C.F.R. § 416.926a(h). School-age children demonstrate this function by completing assignments, organizing their materials, refraining from distracting others, and easily transitioning, between tasks. *Id.* . § 416.926a(h)(2)(ii). Plaintiff cites the same sources, as well as progress reports from the school. (Doc. 17 at 10-11.) Ms. Flowers found two areas in this domain

with "very serious" problems, one area with a "serious" problem, and the rest of the thirteen areas with "obvious" or "slight" issues, if any. (Tr. at 190.) And again, she noted he "can manage these activities independently if he takes his medicine." (*Id.*) A.C.R.'s mother testified that he was taking his medication regularly. (Tr. at 58.) Ms. Maniscalco reported more difficulty in this domain; but she did not say he was uniformly struggling in all areas; she instead pointed to his involvement in "social malfunctioning relationships" as the source of his distractions. (Tr. at 260.)

The ALJ acknowledged the difficulties here, but noted that A.C.R.'s kindergarten and first grade records did not suggest problems in this domain. (Tr. at 36, 249, 257.) Dr. Hayter observed that A.C.R.'s "immediate attention is intact," but he may have difficulties sustaining concentration. (Tr. at 276-77.) Dr. Boneff thought he displayed "strengths in immediate and short-term memory and the ability to pay attention," and concluded that these results "argu[ed] against the presence of at least inattentive components to the possible ADHD diagnosis." (Tr. at 36, 305, 307.) Moreover, A.C.R. made good efforts during his testing with Dr. Boneff. (Tr. at 305.) The ALJ's finding in this domain mirrored the medical consultants' opinion. (Tr. at 88.) Thus, the weight of medical authority supported the ALJ against Plaintiff's loose reading of two non-medical opinions.

Finally, substantial evidence supports the ALJ's finding of marked limitation in A.C.R.'s ability to interact and relate to others. (Tr. at 38.) "Interacting means initiating and responding to exchanges with other people." 20 C.F.R. § 416.926a(i)(1)(i). "Relating to other people means forming intimate relationships with family members and with friends who are [the claimant's] age, and sustaining them over time." *Id.* § 416.926a(i)(1)(ii). School-age children should be able to form lasting friendships, work in groups, understand different points of view, tolerate differences, and speak to people of all ages "in a manner that both familiar and unfamiliar listeners readily understand." *Id.* § 416.926a(i)(2)(iv).

20

Plaintiff brings no new sources or analysis to this argument. (Doc. 17 at 10.) Ms. Maniscalco's report discussed A.C.R.'s "social malfunctioning relationships," and significant issues in over half of the thirteen areas in the domain. (Tr. at 261.) Ms. Flowers's report did not suggest such issues; she found "obvious" problems or less in all but two of the thirteen areas. (Tr. at 199.) She also noted that "[m]ost of the time [he] complies without getting up and repeating himself and his activities." (*Id.*) However, her subsequent report indicated more substantial problems with his classroom disruptions and interactions. (Tr. at 311-12.)

Medical evidence does not bear Plaintiff's contentions. First, the ALJ largely credited the teachers' opinions. (Tr. at 38.) He noted, however, that the behavioral problems did not manifest until March 2010, though the school observed the moderate articulation delay in 2008. (Tr. at 38, 214, 224, 230, 294-97.) A.C.R.'s therapy sessions in 2011 ended after the first meeting because he achieved treatment goals; despite the therapist's initial recommendation of weekly counseling. (Tr. at 38, 315-17.) A.C.R. and his mother testified that he was doing better in school after his medication and schedule changed. (Tr. at 38, 53-54, 57-59, 68.) It also appears that he would eventually complete at least some of his chores. (Tr. at 55.) Additionally, he maintained friendships at school and socialized with his cousins at home. (Tr. at 38, 55, 299.) His relationship with his siblings vacillated between "good" and "bad." (Tr. at 55.) At the hearing, the ALJ listened as the mother described A.C.R.'s difficulties with peers and pointed out, "most kids are like that, but then after a while then they're friends again." (Tr. at 63.) This evidence does not show an "extreme" limitation; rather it shows significant problems, at times, but also somewhat normal interactions. The recent changes in medication and schedule appear to have blunted the worst behavior. Thus, the evidence supports the ALJ's conclusion.

I therefore suggest that substantial evidence supports the ALJ's findings and recommend that his decision be upheld.

### 3.    Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response

proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 5, 2014                           /S PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  August 5, 2014                  By____s/Jean L. Broucek_____
                                       Case Manager to Magistrate Judge Morris